JOAN EMELIA SEALEY PENA, Plaintiff

v.

CARMELO PENA, Defendant

Civil No. 101-1970

District Court of the Virgin Islands

Div. of St. Croix

December 14, 1971

FRANK PADILLA, ESQ., Frederiksted, St. Croix, V.I., *for plaintiff*

J. MICHAEL SPENCER, ESQ., Frederiksted, St. Croix, V.I., *for defendant*

CHRISTIAN, *Chief Judge*

MEMORANDUM

This divorce action came on to be heard on November 20 and 23, 1970, on the complaint of plaintiff for a decree of absolute divorce on the ground of incompatibility of temperament, and upon the counterclaim of defendant for the same relief and on the identical ground. The plaintiff appeared in person and with counsel, Victor G. Schneider, Esq., subsequent to the hearing succeeded by Frank Padilla, Esq. The defendant appeared personally and with counsel, J. Michael Spencer, Esq. At the conclusion of the hearing, the matter was adjourned in order that each side might marshal and present further evidence bearing on the financial activities of the parties throughout the period of their marriage and the better to permit the Court to decree an

equitable property settlement. At the request of the parties, a transcript of the testimony was prepared and the cause was submitted to the Court for its decision on the transcript and files.

The parties are both residents and domiciliaries of the Virgin Islands having resided therein for many years immediately preceding the commencement of this action. They were married in Christiansted, St. Croix, on January 15, 1963. Four children were born to the marriage namely, Cedahlia, age 7, Celestia and Cedron, twins, age 6 and Claudia, age 5. The Court is satisfied that it has jurisdiction of the parties as well as the cause of action.

The parties to this action experienced, in their efforts to sustain their marriage, numerous and apparently irreconcilable differences of attitude and life style, rendering them unable to live together. Central among these was the problem of their attitudes toward the children of prior marriages, and the correspondingly discordant attitude of these children toward their step-parents. Mrs. Pena described her distress over her husband's treatment of her older children—refusing them food in the house because he wished to save it for his own lunch at work; turning out the lights in the home early in the evening because he liked to sit in the dark, thus making it impossible for the children to study in the home; shouting at the children and reminding them that he was not their father. All of these incidents, according to plaintiff, resulted in "big quarrels" which continued to occur throughout their co-habitation. As to her relationship with her husband's children of his prior marriage, she indicated that they ignored her and refused to speak to her, and that they generally made her life an unhappy one from early in the marriage. She further stated that the reason for their first separation was her desire to avoid defendant's former in-laws and particularly to escape the unpleasant relationship with these grown

children. She felt forced to abandon the home when, after having promised her to arrange the purchase of land elsewhere, defendant was apparently dissuaded by one of his older children. Thus, the children of former unions constituted a continuing irritant to this relationship, and plaintiff at least, was unable to separate her feelings for her children and her reaction to her husband's children from her feelings toward him. It further appears that Mr. Pena was subject to a conflict of loyalties between his older children and his wife, and was of such a personality that he could not resolve this conflict as would have been necessary to achieve compatibility with his wife.

A second major component of the dissonance in this marriage is Mr. Pena's jealous accusations of infidelity against his wife. There was testimony that he accused his wife of consorting with the person from whom she purchased their Peter's Rest property, and the construction men who worked on the property. Plaintiff stated that her husband, in his jealousy, chased away men she had hired to work on the property, forcing her to seek continuous replacements. She described these accusations as continuing throughout the period of their marriage and further described nightly arguments wherein he would criticize her and charge her with wasting money. It should be noted that Mr. Pena's testimony suggests that these accusations may have been based on more than blind jealousy, but in any event, defendant was clearly devoted to his wife, who is considerably younger than he, and presumably these quarrels resulted from some combination of her youth and outside interests, and his possessiveness and insecurity. The combination proved explosive in December, 1969, when Mr. Pena, enraged by his wife's repeated overnight absences, confronted her on the steps of their home armed with a knife and told her that, but for the children, he would kill her and suffer the consequences.

■ Overall, incompatibility appears clearly from the statements of both parties—the younger, strongwilled wife and the conciliatory but possessive husband—and on this record, that incompatibility is clearly irreconcilable. As to this the parties agree. The parties submitted for decision on the record the issues of divorce, child custody and support, alimony and property division. Because the record does not reflect evidence of a single party at fault, but rather of persons irremediably divided by character differences, divorce absolute should be granted to both husband and wife.

■■ Although Mr. Pena's testimony raised some question as to his wife's conscientiousness in caring for their children (he said she regularly was gone all night requiring him to hire persons to watch the children until she returned late in the morning) because of his age, 56, and the natural inclination to leave such young children in the care of their mother, who is only 34 years old, custody of the children should be awarded to her. Defendant shall contribute $65 per week for the support of the children. Rights of reasonable visitation shall be reserved to defendant.

The record indicates that both parties have been employed in the past, earning approximately equivalent salaries. Plaintiff emerges from her own testimony as a more than competent individual, not dependent on her husband for his financial assistance. Alimony in these circumstances would be inappropriate, and no lump sum in lieu thereof should be granted.

It has long been a legal reality, perhaps unfortunate, that a woman's participation in a marriage as a "housewife" has often not been considered of economic value when courts have been called upon to determine an equitable distribution of the marital assets. The man's role as the aggressive partner, initiating financial ventures

and only seeking his wife's concurrence as a formality, is common, and naturally tends to detract attention from the more subdued, supportive role often played by the woman. More recently it has been acknowledged that the sacrifice involved in a woman's devotion and bond to the home is a critical factor in the man's common stance as the direct source of income to the couple. Where this relationship obtains, clearly the two parties must not be subjected to comparison on the basis of precise paychecks earned. Their contributions, though of different kinds, are of comparable value. In this case, focus on the financially aggressive partner may similarly distract attention from the contribution of the more subdued and passive spouse, although in this instance the man has taken the latter role.

Although Mrs. Pena has been the active force in economic development for this couple, it is clear that while she was single she did not attempt the kinds of financial ventures which, during the course of this marriage, she successfully pursued. Defendant testified that he, for the most part, left business matters to his wife's discretion, but this does not deprive him of his rights as a partner in the marriage, any more than allocation of financial responsibility to him alone would have suggested that his wife could not share in the product of his efforts. As partners to a marriage, both parties contributed what was most appropriate, in keeping with their character and temperament. It is clear now that those very qualities of character and temperament ultimately rendered this man and woman incompatible as marital partners, but during the course of their efforts to succeed with their marriage, it cannot be said that Mr. Pena did not carry a substantial proportion of the emotional and financial weight. Thus the property acquired by the parties during coverture must be examined

to determine in what specific amounts either husband or wife made contribution.

The principal assets owned by Mr. and Mrs. Pena are three parcels of real property; Lot 90, Wheel of Fortune; a parcel in Estate Grove Place; and several parcels in Estate Peter's Rest. All of these lots are improved.

■ The Wheel of Fortune property was in defendant's name at the time of this marriage, although since that time, under plaintiff's direction apparently, substantial improvements have been effected, and she claims that mortgage payments on that property have been and continue to be made from the rental income of the Peter's Rest property and from her personal funds. Thus, this property cannot be treated as a sole and separate asset of defendant, but must rather be considered at least partially a marital asset.

The lots in Peter's Rest were apparently first purchased by down payment financed by Mrs. Pena through a personal loan in her name. She claimed to have made some mortgage payments from her own salary, to have arranged with a personal friend to begin construction of a building on credit to enable her to secure a loan to finance the present extensive improvements, and to have forced her husband to co-sign the later loan she arranged against his wishes, because the bank insisted that he co-sign. He claims that most of the improvements were products of his own labor. However, she admits that most mortgage payments were made from the rental income of this property and the Wheel of Fortune property. Plaintiff maintained that the Peter's Rest land, by agreement of the parties, was to be transferred to their children, but defendant denied this at trial.

The property in Estate Grove Place was purchased partially with funds borrowed on a jointly signed loan, and

also apparently with funds borrowed by plaintiff separately, although the sale was consummated by her alone in March, 1970, several months after the parties had separated.

Under these circumstances, the wife being entitled by law to the value of her independent acquisition of property and improvements (16 V.I.C. 67, 68, 69) the parties have agreed to the following distribution of assets, which I find to be reasonable.

1. Lot 90, Wheel of Fortune shall be the sole property of Mr. Pena, free of any claims of Mrs. Pena for her contributions thereto.

2. The lots 266 and 267 Peter's Rest shall be the sole property of the plaintiff. However, simultaneously with entry of this decree, an instrument shall be executed by Mrs. Pena transferring title to the children of this marriage, and appointing her trustee until all of the children attain their majority, at which time fee title shall rest in them. To this, both parties have agreed, and thus there is no invasion of vested property rights, c.f., Farley v. Farley, 227 Cal. App.2d 1, 38 Cal. Rptr. 357, cert. den., 379 U.S. 945.

Plaintiff shall be responsible for liquidation of the mortgage in favor of Virgin Islands National Bank encumbering this property and Lot 90, Wheel of Fortune.

3. Mrs. Pena shall be the sole owner of the property in Grove Place. She shall be responsible for the loan of December, 1969, Account number 5405.

4. Plaintiff shall execute a note in the sum of $12,000, payable to defendant within one year from the date December 7, 1971, without interest and to be secured by the Peter's Rest properties. Failing payment of this note at the expiration of one year, statutory interest shall become payable thereafter.

5. The parties shall bear their own costs of litigation in this action.

Let a decree be entered accordingly.